



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed May 6, 2016**

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § § | |
| Thomas Benjamin Chapman and Mari Sherin Chapman, | § § § | Case No. 14-40831-mxm-7 |
| | § § | Chapter 7 |
| Debtors. | § § | |
| | § | |
| Carolyn Stevens, Individually and as Assignee of the Estate of Maydell Liebreich, Deceased, | § § § § § | |
| Plaintiff. | § § | |
| v. | § § | Adversary No. 14-04064 |
| Thomas Benjamin Chapman and Mari Sherin Chapman, | § § § § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On March 1, 2016, the Court held a trial on the complaint filed by Plaintiff Carolyn Stevens to declare Defendants' debt to her nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (a)(4). Plaintiff died prior to trial, but her daughter Sabrina Ann Stevens appeared and prosecuted the claim as the administrator of her mother's estate.[1]

Because Plaintiff did not prove certain nondischargeability elements by a preponderance of the evidence, the Court will enter a separate judgment for Defendants. The Court makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52 of the Federal Rules of Civil Procedure.

### BACKGROUND

1. This dispute arises out of an agreement concerning the rehabilitation construction work and anticipated resale of two houses, one on Royal Lane in Dallas, Texas and the other on Carry Back Circle in Dallas, Texas.

2. Plaintiff claims to have acquired a sole fee ownership in the Royal Lane property under the last will and testament of Plaintiff's friend Ms. Maydell Liebreich.[2] Plaintiff was appointed independent executor of Ms. Liebreich's probate estate in December 2011, but was subsequently removed as executor sometime after May 22, 2012, when Plaintiff, on behalf of Ms. Liebreich's estate, transferred the Royal Lane property to Defendant Thomas Chapman (discussed below). The Royal Lane property was not encumbered by a mortgage lien.

3. Plaintiff owned the Carry Back property, which was encumbered by a Wells Fargo mortgage lien of at least $125,000.

---

[1] For convenience, the term "Plaintiff" shall refer to Carolyn Stevens and, where appropriate, to her estate as administered by Sabrina Ann Stevens.

[2] Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 11.

4. On or about April 28, 2012, Plaintiff entered into a Memorandum of Understanding[3] with Ron Page and Defendant Thomas Chapman, who did business as Rockstar Construction. Ron Page prepared the Memorandum of Understanding. The stated intent of the document was to define the roles, responsibilities, and expectations of the parties concerning the "purchase, rehab, and resell" of the Royal Lane and Carry Back properties.

5. According to the Memorandum of Understanding:

   a. Ron Page was to receive 32.5% of the net profits for his work managing the day-to-day construction and rehabilitation work on the two houses. Thomas Chapman was to receive 37.5% of the net profits for contacting "hard money" lending sources, tracking expenses, selecting contractors, and being responsible for overall project design and scope. Plaintiff was to receive 30% of the net profits, apparently for providing the two houses.

   b. The Royal Lane and Carry Back properties were worth $122,000 and $72,500, respectively (prior to repairs), and would not support a bank loan given their dilapidated condition.

   c. The anticipated after-repair sale prices for the properties were $250,000 for Royal Lane and $190,000 for Carry Back.

   d. The estimated rehabilitation costs were $67,000-72,500 for Royal Lane and $70,000-78,000 for Carry Back.

   e. "General risks" included an uncertain real estate market and difficulty in estimating accurately the true repair and rehabilitation costs due to obstructions in the houses.

---

[3] Pl.'s Ex. 1. The document is dated April 28, 2012 but was signed by the parties on May 1, 2012.

    f. "Carolyn Stevens risks" included leaving the properties as they were and, allegedly, subjecting Plaintiff's homestead property (a third property) to the claims of Wells Fargo, the mortgage lender on the Carry Back property.

    g. "Rehab project risks for Carolyn" included "No risks" since she was "[n]ot borrowing the money, not doing the rehab, not running the project."

    h. "Tom Chapman Risks" included "assuming huge potential liability as once he is tied to the properties his own personal property [house, cars, etc] is also potentially exposed to creditors should anything go wrong on the project."

    i. Plaintiff was to remove her personal belongings from both properties promptly so that work could be completed quickly without incurring unnecessary, additional daily interest on loans that would be required to complete the projects.

6. Sabrina Ann Stevens advised her mother not to sign the Memorandum of Understanding, but Plaintiff ignored her advice, choosing instead to rely on the recommendations of Ron Page, who drafted the Memorandum of Understanding. Ron Page was not a party in the litigation, was not called as a witness, and did not appear at trial.

7. Third-party financing was required to fund the rehabilitation projects contemplated by the Memorandum of Understanding. Therefore, by a deed dated May 22, 2012, the Royal Lane property was transferred from "Carolyn Stevens, individually and as independent executor of the estate of Maydell Liebreich deceased," as "Grantor," to "Thomas Chapman, d/b/a

Rockstar Construction Unlimited One," as "Grantee."[4] Also on May 22, Thomas Chapman borrowed $125,000 from "Robert York and Alice York, c/o Noble Capital Servicing," using the Royal Lane property as collateral. Thomas Chapman represented in the Seller/Owner Affidavit for the loan that he was the owner of the Royal Lane property.[5]

8. Thomas Chapman testified at trial that the transfer of the Royal Lane property to him was consistent with local industry practice and allowed him to obtain financing for the rehabilitation.

9. The settlement statement for the York loan contained a line item of $55,114.63 for "Proceeds to be Applied to Carryback St." and a line item of $60,000 for "Construction Escrow Account."[6]

10. Sometime after the May 22, 2012 transfer of the Royal Lane property and loan closing, Plaintiff was replaced as executor of the Liebreich probate estate by a court-appointed dependent administrator, Karen Washington. It is not clear whether Plaintiff was replaced as executor due to her actions in transferring the Royal Lane property on behalf of the Liebreich estate or for some other reason.

11. Thomas Chapman, Ron Page, and their work crews immediately began work on the Royal Lane property. They were prevented, however, from commencing work on the Carry Back rehabilitation project because Plaintiff had failed to timely remove her substantial possessions from the Carry Back house as required by the Memorandum of Understanding. The

---

[4] The actual deed was not offered or admitted into evidence, but Plaintiff and Defendants appear to agree to this description of the transfer.

[5] Pl.'s Ex. 10.

[6] Pl.'s Ex. 2.

Carry Back house remained full to the brim (in "hoarder" fashion) with possessions and debris and animal feces.

12. By letter dated August 3, 2012, Thomas Chapman notified Plaintiff that due to the delay caused by Plaintiff's failure to remove her possessions from the Carry Back house, and

> [r]ather than charging a disruption fee to the project we are going to temporarily borrow construction funds to pursue other rehab projects. The monies borrowed will be repaid to the Carryback [sic] project upon the completion and sale of the rehab projects. We will continue with the Carryback [sic] rehab as originally agreed to.[7]

13. There is no evidence that Plaintiff notified Thomas Chapman that she disagreed with his use of the construction funds described in his August 3, 2012 letter. In any event, Thomas Chapman returned the borrowed funds shortly after the borrowing.

14. Meanwhile, the work on the Royal Lane property progressed and resulted in an October 2012 sale to a third party for $235,000. The settlement statement for this sale reflects that after costs of sale and payoff of the York mortgage, Thomas Chapman received net sale proceeds of $103,252.10.[8] Although the actual rehabilitation costs for the Royal Lane project were materially greater than those projected by the Memorandum of Understanding, the evidence established that all of the rehabilitation work was completed in a quality and workmanlike manner for a reasonable cost.

15. Thomas Chapman notified Plaintiff of the Royal Lane sale and asked her if she wanted her share of the net sale proceeds. Plaintiff replied that she wanted him to apply her proceeds to costs necessary on the Carry Back property.

16. Despite conditions in the house, limited work commenced on the Carry Back property until Plaintiff notified the work crews in November or December 2012 that she wanted

---

[7] Pl.'s Ex. 5.

[8] Pl.'s Ex. 7.

them to leave the premises and cease work on the property. Plaintiff gave no reason for demanding the departure of the work crews.

17. Thomas Chapman was ready and willing to return and complete the Carry Back project if and when Plaintiff asked him to return to the project, but she never did.

18. Plaintiff never received any proceeds from the sale of the Royal Lane property and never otherwise received her share of net profits under the Memorandum of Understanding.

19. Approximately $31,000 in net proceeds remained after the Royal Lane sale closing and after work on Carry Back ceased. Thomas Chapman spent those remaining funds on the bills of his construction company.

20. In May 2014, the Liebreich probate estate, through the dependent administrator, assigned to Plaintiff all of the estate's claims, if any, against Defendant Thomas Chapman.

21. On February 27, 2014, Defendants filed for Chapter 7 bankruptcy relief in this Court.

22. On June 23, 2014, Plaintiff filed this adversary proceeding against Defendants, seeking a declaration that Defendants' debt to her is nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (a)(4).

23. On August 25, 2015, Plaintiff's counsel filed a notice with the Court that Plaintiff died on August 11, 2015. The Court approved a subsequent motion filed by Plaintiff's counsel to withdraw from the representation after Sabrina Ann Stevens notified counsel that she would be substituting in as plaintiff and she did not want to retain Plaintiff's counsel.

24. The Court held a trial on March 1, 2016.[9] Both Defendants testified, as did their son Mitchell Chapman and a work crew member, Matt McDermott. Sabrina Ann Stevens also testified.

## ANALYSIS

25. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334, 151, and 157 and the standing order of reference in this district. This proceeding is core pursuant to 28 U.S.C. § 157(b)(2)(I). Venue is proper in this district under 28 U.S.C. § 1409(a).

26. To except a debtor's debt from discharge under 11 U.S.C. § 523(a)(2)(A) or (a)(4), a plaintiff creditor must prove his or her claim by a preponderance of the evidence. *Grogan v Garner*, 498 U.S. 279, 289-91 (1991). In this case, Plaintiff has not met her burden.

27. ***Section 523(a)(2)(A).*** Section 523(a)(2)(A) of the Bankruptcy Code excepts from a debtor's discharge any debt for (among other things) "money, property, [or] services . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

28. According to Plaintiff, numerous alleged statements, actions, and omissions support a finding of false pretenses, false representation, or actual fraud by Thomas Chapman. The Court disagrees. The Court's findings to the contrary (in addition to the findings above) follow each allegation:

- **Allegation(s):** Thomas Chapman did not have expert knowledge as to the construction or real estate industries or the values of residential real property in North Dallas, Texas, contrary to his representations to Plaintiff.

---

[9] Neither Plaintiff nor Defendants were represented by counsel during the trial; rather, all of the parties were pro se.

- **Finding(s):** Thomas Chapman did have such expert knowledge. He was a credible witness, as was his son Mitchell Chapman and Matt McDermott, who each testified to Thomas Chapman's knowledge and skills. Plaintiff provided no credible evidence to the contrary.

- **Allegation(s):** Thomas Chapman and his subcontractors were not qualified to perform construction services in a good and workmanlike manner, contrary to his representations to Plaintiff.

    - **Finding(s):** As reflected in the credible testimony of Thomas Chapman, Mitchell Chapman, and Matt McDermott, they and their work crews were qualified and provided services in a good, quality, and workmanlike manner. Plaintiff, on the other hand, provided no credible evidence in support of her allegation or to contradict the credible testimony and evidence presented by Defendants.

- **Allegation(s):** The "true value" of the Royal Lane property was not $122,000 in April 2012, but was in the minimum amount of $174,080, and the property would qualify for a bank loan, contrary to Thomas Chapman's representations to Plaintiff.

    - **Finding(s):** Plaintiff provided no credible evidence to support her allegation about the actual value of the Royal Lane property in April 2012 or its ability to support a bank loan. Moreover, it is not clear that Thomas Chapman made such representations, which were in a Memorandum of Understanding prepared by Ron Page and signed by all three parties. The statements in the Memorandum of Understanding are better characterized

   as either the representations of Ron Page—who prepared the document—
   or the joint representations of all three parties who signed it.

- **Allegation(s):** The value of the Carry Back property was not $72,500 in April 2012 or an amount far less than the Wells Fargo lien, but was in the minimum amount of $180,440, contrary to Thomas Chapman's representations to Plaintiff.

  - **Finding(s):** Plaintiff provided no credible evidence to support her allegation about the actual value of the Carry Back property in April 2012 or its ability to support a bank loan, and the uncontested evidence was that the house was in a deplorable condition. Moreover, it is not clear that Thomas Chapman made such representations, which were in a Memorandum of Understanding prepared by Ron Page and signed by all three parties. The statements in the Memorandum of Understanding are better characterized as either the representations of Ron Page—who prepared the document—or the joint representations of all three parties who signed it.

- **Allegation(s):** Plaintiff's "biggest risk" was not to keep the properties, and Plaintiff could have sold the properties for amounts far in excess of the Wells Fargo lien amount, contrary to Thomas Chapman's representations to Plaintiff.

  - **Finding(s):** Plaintiff provided no credible evidence to support her allegation concerning the value of the houses before rehabilitation. Moreover, it is not clear that Thomas Chapman made any such representations, which were in a Memorandum of Understanding prepared by Ron Page and signed by all three parties. The statements in the

Memorandum of Understanding are better characterized as either the representations of Ron Page—who prepared the document—or the joint representations of all three parties who signed it.

- **Allegation(s):** Plaintiff's homestead property (a third property) was not "exposed to [Wells Fargo] reclaiming assets for the true value of the Carry Back Property," as the homestead property was not subject to the Wells Fargo lien, and the Wells Fargo loan was a non-recourse loan, contrary to Thomas Chapman's representations to Plaintiff.
    - **Finding(s):** Thomas Chapman testified, without contradiction, that these statements were made by Plaintiff and Ron Page and not by Thomas Chapman. Even though those same statements are in the Memorandum of Understanding, those statements are better characterized as either the representations of Ron Page—who prepared the document—or the joint representations of all three parties who signed it.
- **Allegation(s):** Even if Plaintiff "did nothing," the properties' value would have exceeded the amount of the Carry Back mortgage, contrary to Thomas Chapman's representations to Plaintiff.
    - **Finding(s):** Plaintiff provided no credible evidence to support this allegation about the properties' value. Moreover, it is not clear that Thomas Chapman made any such representations, which were in a Memorandum of Understanding prepared by Ron Page and signed by all three parties. The statements in the Memorandum of Understanding are better characterized as either the representations of Ron Page—who

prepared the document—or the joint representations of all three parties who signed it.

- **Allegation(s):** Plaintiff had considerable risks in transferring title to Defendant and in entering into the contract, and Plaintiff was never given "co-signing authority on all checks to ensure the" remodeling funds were spent "as planned," contrary to Thomas Chapman's representations to Plaintiff.

  - **Finding(s):** There is not sufficient evidence in the record that Thomas Chapman made any such representations, which were in a Memorandum of Understanding prepared by Ron Page and signed by all three parties. Even if Thomas Chapman had made such representations through the Memorandum of Understanding, that document also disclosed the risks related to the uncertain real estate market and the difficulty in estimating accurately the true repair and rehabilitation costs for each of the projects. Moreover, Plaintiff provided no evidence concerning the parties' alleged noncompliance with the obligation to provide Plaintiff co-signing authority on all checks.

- **Allegation(s):** Defendant Thomas Benjamin Chapman did not "assum[e] huge potential liability" or subject his house or cars to liability "to creditors" by entering into the contract, contrary to Defendant's representations to Plaintiff.

  - **Finding(s):** There is not sufficient evidence in the record that Thomas Chapman made such representations, which were in a Memorandum of Understanding prepared by Ron Page and signed by all three parties. Even if Thomas Chapman had made such representations through the

> Memorandum of Understanding, the evidence establishes that Thomas Chapman did assume risk by undertaking the projects, taking title to the Royal Lane property, and incurring debt to complete the rehabilitation projects for each of the houses.

- **Allegation(s):** Plaintiff did not have to transfer to Defendant title to the Royal Lane property to obtain construction services or construction funds, and such a practice was not common in the residential construction industry, contrary to Defendant's representations to Plaintiff.

  - **Finding(s):** Plaintiff provided no credible evidence to support her allegation. Rather, Thomas Chapman testified credibly that transfer of title under these circumstances was consistent with local industry practice and was necessary to obtain the required loans to fund the projects.

- **Allegation(s):** Defendant did not remodel both properties or sell both properties for the minimum amount of $440,000, contrary to Defendant's representations to Plaintiff.

  - **Finding(s):** The Memorandum of Understanding (even if it could be construed as Thomas Chapman's representation when it was prepared by Ron Page) noted that the projected sale prices were estimates and that the real estate market was uncertain. The evidence established that Thomas Chapman did the best he could under the circumstances and that Plaintiff was frequently provided updates of the expenses being incurred as the work progressed. In addition, the uncontroverted evidence established that Plaintiff personally visited the project work sites several times a week.

- **Allegation(s):** Defendant did not pay Plaintiff a percentage of the sale of either or both properties in the minimum amount of $183,275, or in any amount, and the Wells Fargo lien was not paid, contrary to Defendant's representations to Plaintiff.
    - **Finding(s):** Thomas Chapman's failure to pay Plaintiff a percentage of the profits was, at most, a breach of the Memorandum of Understanding. Plaintiff provided no credible evidence that Thomas Chapman took Plaintiff's money or her alleged house with any kind of fraudulent intent. The evidence further established that all three parties to the Memorandum of Understanding hoped to make a profit and that Thomas Chapman was precluded from completing the Carry Back property due to Plaintiff's failure to remove her possessions from the house timely as agreed and due to her demand that the work crews leave the Carry Back property prior to the completion of the rehabilitation project.
- **Allegation(s):** Defendant did not provide an accounting to Plaintiff on an ongoing basis for expenses or income related to either or both properties, and has not accounted for the proceeds of the sale of the Royal Lane property, the personal property removed from the Carry Back or Royal Lane property, or construction funds pertaining to the real properties.
    - **Finding(s):** Plaintiff provided no credible evidence to support her allegations. Rather, the evidence established that Thomas Chapman and his work crews provided Plaintiff with frequent updates on the expenses being incurred and progress of work being performed for each of the house projects. Although the accounting Thomas Chapman provided

Plaintiff was less than perfect, there is no evidence that he obtained anything of value from Plaintiff through false pretenses, false representations, or actual fraud.

- **Allegation(s):** Defendant did not inform Plaintiff of any of the transactions involving Plaintiff's real or personal properties after Defendant obtained access to or possession of the properties and did not obtain Plaintiff's consent to the construction charges or the sale of the Royal Lane property.
    - **Finding(s):** Plaintiff provided no credible evidence to support these allegations. Rather, the evidence established that Thomas Chapman and his work crews kept Plaintiff informed throughout the process and that Plaintiff was aware of the construction charges and the sale of the Royal Lane property.
- **Allegation(s):** Defendant did not inform Plaintiff that Defendant overpaid unqualified and inexperienced relatives and friends to perform construction services that either were not performed or were deficiently performed.
    - **Finding(s):** Plaintiff provided no credible evidence to support these allegations. Rather, the evidence established that Thomas Chapman and his work crews were qualified and experienced and did a good and quality job for fair and reasonable consideration under the circumstances.

29.    In summary, Plaintiff failed to prove that Thomas Chapman obtained money, property, or services through false pretenses, false representation, or actual fraud. Plaintiff's claim that Mari Chapman acted in concert with Thomas Chapman also fails for the same reason.

30.     ***Section 523(a)(4).*** Section 523(a)(4) of the Bankruptcy Code excepts from a debtor's discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The evidence admitted in this trial is not sufficient for Plaintiff to prevail on this claim.

31.     **Fraud or defalcation while acting in a fiduciary capacity**. Plaintiff asserts Thomas Chapman breached his fiduciary duty to her because he was the "trustee" of misused and misdirected loan-receipt trust funds and construction-payment trust funds and Plaintiff, as property owner, was a "beneficiary" of those trust funds under Texas Property Code sections 162.001, 162.002 and 162.003(b).[10]

32.     A creditor claiming section 523(a)(4) nondischargeability through the Texas Construction Trust Fund Statute must show that (1) the contractor intentionally, knowingly, or with intent to defraud diverted trust funds that should have been paid to the beneficiary, and (2) the affirmative defenses in the statute do not apply.[11] Plaintiff's claim fails for at least three independent reasons.

33.     First, Plaintiff is not a beneficiary of the alleged loan-receipt trust funds. Section 162.001(b) of the Texas Property Code creates trust funds if the funds are borrowed by a contractor (here, allegedly Thomas Chapman) for the specific purpose of improving real property, and the loan is secured in whole or in part by a lien on the property. Section 162.003 of the Texas Property Code provides corresponding protection to the owner of that property by

---

[10] Plaintiff also alleges that Thomas Chapman owed a fiduciary duty under the Memorandum of Understanding and common law, but Plaintiff has not briefed this issue, and the Court cannot conclude from the evidence that any such fiduciary duty existed.

[11] *In re Pledger*, 592 F. App'x 296, 302 (5th Cir. 2015). "In the bankruptcy context, the burden is on the creditor to establish that an affirmative defense is inapplicable—rather than on the debtor to establish that one is applicable—because the creditor has the ultimate burden of proving that a debt falls within the scope of 11 U.S.C. § 523(a)(4)." *Id.* at 302 n.2.

making the property owner a beneficiary of the trust funds. But the only qualifying property under the statute is the Royal Lane property because it (not the Carry Back property) secured the York loan, and the owner of the Royal Lane property at the time of the borrowing was Thomas Chapman, not Plaintiff.[12]

34. Second, even if monies received by Thomas Chapman somehow could be construed as construction-payment trust funds under Texas Property Code section 162.001(a)—or even if Plaintiff were somehow a beneficiary of loan-receipt trust funds under section 162.001(b)—Plaintiff failed to show that the affirmative defense in Texas Property Code section 162.031(b) does not apply. That defense protects Thomas Chapman if trust funds not paid to a beneficiary "were used by the trustee to pay the trustee's actual expenses directly related to the construction or repair of the improvement."[13]

35. The Fifth Circuit has interpreted this affirmative defense to protect a trustee if he uses trust funds to pay overhead expenses of the failing company (such as telephone bills or salaries) or even if he diverts funds to other company projects in order to keep the struggling business alive.[14]

36. Both alleged diversions of funds fall within this affirmative defense. After Plaintiff prevented work from progressing on Carry Back by failing to remove her belongings from the property, Thomas Chapman borrowed (and repaid) $5,000 of project funds to use as a deposit on another company project in Fort Worth. When work finally did proceed on Carry

---

[12] It is questionable whether Plaintiff ever owned the property since it appears the property was transferred from the probate estate of Maydell Liebreich to Thomas Chapman. Even if Plaintiff had owned the property at some point, she was not the owner at the relevant time—when the funds were borrowed from the Yorks.

[13] TEX. PROP. CODE § 162.031(b).

[14] *In re Pledger*, 592 F. App'x at 299-303 (interpreting *In re Swor*, 347 Fed.Appx. 113, 116 (5th Cir. 2009) and *In re Nicholas*, 956 F.2d 110, 114 (5th Cir.1992)).

Back, Plaintiff ordered Thomas Chapman's work crews to leave the property without explanation. Plaintiff never invited them back to complete the project, even though Thomas Chapman was willing to finish the project. Only then did he spend the remaining funds in the approximate amount of $31,000 on company bills, including cell phone and insurance bills. There is no evidence that Thomas Chapman lined his pockets personally with the funds or used construction funds "for something frivolous, like a luxury company car."[15]

37. Third, Plaintiff failed to show that Thomas Chapman had any type of fraudulent intent or culpable state of mind. Fraud in a fiduciary capacity under section 523(a)(4) requires positive fraud involving moral turpitude or intentional wrong. *Bullock v. BankChampaign, N.A.*, 133 S.Ct. 1754, 1759 (2013). Defalcation under section 523(a)(4) requires a culpable state of mind involving knowledge of, or gross recklessness with respect to, the improper nature of the fiduciary behavior. *Id.* at 1757. Thomas Chapman acted at all times in good faith and with the reasonable hope and expectation that the parties would make a profit on the properties.

38. For these reasons, Plaintiff failed to show that Thomas Chapman committed fraud or defalcation while acting in a fiduciary capacity. Plaintiff's claim that Mari Chapman acted in concert with Thomas Chapman also fails for the same reason.

39. **Embezzlement and Larceny.** Plaintiff asserts that Thomas Chapman wrongfully acquired the Royal Lane property, wrongfully exercised control over and diverted loan proceeds, and wrongfully exercised control over Plaintiff's personal possessions at the Royal Lane and Carry Back properties. Plaintiff's claim fails for largely the same reasons detailed above.

40. Embezzlement under section 523(a)(4) is the fraudulent appropriation of property by a person who is entrusted with that property or who has possession of it lawfully. *In re*

---

[15] *In re Pledger*, 592 F. App'x at 301.

*Miller*, 156 F.3d 598, 602 (5th Cir. 1998). There must be proof of the debtor's fraudulent intent in taking the property. *Id.* at 602-03. Larceny is the fraudulent and wrongful taking and carrying away of somebody else's property with the intent to convert it to the taker's use and to deprive the owner of the property permanently. *Smith v. Hayden (In re Hayden)*, 248 B.R. 519, 526 (Bankr. N.D. Tex. 2000). Other than the manner in which the funds come into possession of a party, larceny does not differ from embezzlement. *Id.*

41.  As detailed above, Thomas Chapman acquired ownership of the Royal Lane property lawfully, consistent with local industry practice, and in furtherance of the Memorandum of Understanding, and his use and disposition of loan proceeds was proper. Thomas Chapman acted at all times in good faith and with the reasonable hope and expectation that the parties would make a profit on the properties. Furthermore, Plaintiff put on no evidence concerning Thomas Chapman's alleged improper control over Plaintiff's personal possessions at the properties. Plaintiff's embezzlement and larceny claims therefore fail, as does Plaintiff's claim against Mari Chapman for acting in concert with Thomas Chapman.

## CONCLUSION

Plaintiff's section 523(a)(2)(A) claim fails because Plaintiff did not prove by a preponderance of the evidence that Defendants obtained money, property, or services by false pretenses, a false representation, or actual fraud. Plaintiff's section 523(a)(4) claim fails because Plaintiff did not prove by a preponderance of the evidence that Defendants committed a fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. The Court will enter a separate final judgment for Defendants.

### END OF FINDINGS AND CONCLUSIONS ###